**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **GARY BANKS,** ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| vs. ) | **2:03cv659** |
| ) | **Electronic Filing** |
| **JEFFREY BEARD, WILLIAM LOVE,** ) | |
| **ROBERT FRANK, GEORGE MARSH,** ) | |
| **ALBERT NIXON, RANDY MINNICK,** ) | |
| **RANDALL URBAIN, DOE BOWMAN,** ) | |
| **FRED P. MAUE, PHILIP JOHNSON,** ) | |
| **DEPUTY JOEL DICKSON, FRANK** ) | |
| **COLE, ANTHONY BOVO, ROBERT** ) | |
| **STAFFORD, GREG MOHRING,** ) | |
| **JOAN DELIE and REBECCA** ) | |
| **KESSLER,** ) | |
| ) | |
| Defendants. ) | |

## OPINION

Gary Banks ("plaintiff") is a 46 year old convict who is serving a sentence of 7 ½ to 20 years for robbery and related offenses. He has been determined by the Pennsylvania Department of Corrections to be among the most difficult of prisoners, resulting in his placement in the Long Term Segregation Unit ("LTSU"). The LTSU is used to house the most violent, disruptive and defiant prisoners within the system. See, e.g., [Ronald] Banks v. Beard, 399 F.3d 134, 136-141 (3d Cir. 2005)(describing LTSU), rev'd, __ U.S. __, 2006 WL 1749604 (U.S. June 28, 2006); Rivera v. Pa. Dept. Of Corrections, 837 A.2d 525, 529-532 (Pa. Super. 2003)(same). He was placed in the LTSU prior to the spring of 2001, shortly after it was created at the State Correctional Institute at Pittsburgh, and remains there (the LTSU has been maintained at the State Correctional Institute in Fayette following the closure of SCI Pittsburgh).[1]

Plaintiff filed this Section 1983 prisoner civil rights action challenging numerous

---

[1] Commitment to the LTSU is open-ended and subject to the discretion of prison officials. Banks, 399 F.3d at 137. A prisoner is initially committed for 90 days and may earn his way out of the LTSU upon good behavior. Id.

conditions within the LTSU and the treatment he experienced in conjunction with a variety of incidents occurring between May 7, 2001, and May 2, 2003, many of which involved the imposition of discipline.    Plaintiff has named 17 Department of Corrections officers and employees as defendants, many of whom worked at SCI Pittsburgh. Plaintiff seeks to establish his rights under the First, Eighth, and Fourteenth Amendments of the United States Constitution were violated by these individuals and their supervisors.

The case was not vigorously developed during its infancy.  No motions to dismiss or for summary judgement were filed within the time frames in the case management order entered by the magistrate judge.  The case lingered without significant activity and earlier this year this member of the court scheduled the case for trial.  The parties then began to further develop the case through additional filings and submissions. Defendants sought to challenge the legal sufficiency of a number of plaintiff's claims through various motions.  These included an untimely motion for partial summary judgement, which has been converted to defendants' trial brief, and a motion in limine, which was filed after plaintiff's deposition was taken in aid of preparing for trial.  Plaintiff has filed numerous responses to these motions as well as additional pretrial materials in an effort to counter the defendants' challenges to his claims.  Through these submissions plaintiffs' claims have become more clearly delineated and defined.  After reviewing these more recent filings as well as the entire record, it is clear that a number of claims raised by plaintiff cannot proceed to the jury as a matter of law.  Accordingly, the court is issuing this opinion of its own accord in order to narrow the case for trial and properly focus the issues for the submission of evidence.

**I.      Allegations of the Complaint**

Plaintiff's complaint is not a model of clarity and much of the information surrounding plaintiff's claims is not presented in chronological fashion.  In general, he complains that the conditions of the LTSU were so harsh and inhumane that they violated his constitutional rights. He complained about these conditions and protested against them by going on hunger strikes.

2

These complaints and protests were met with disdain and contempt by the correction officers who had to interact with plaintiff, leading to a series of events wherein plaintiff was mistreated. This mistreatment ranged from being placed in strip cells and hard cells that were kept in deplorable and inhumane condition or in a filthy observation cell where he was subjected to lights and a video camera twenty-four hours a day for days at a time, to the denial of newspapers and reading materials from outside sources, to assaults by prison guards followed by the denial of medical treatment for injuries from those assaults, to having his "legal property" and materials destroyed during unauthorized or unwarranted searches of his cell. Plaintiff consistently filed prison grievances about his mistreatment to no avail.

In order to properly evaluate the legal sufficiency of plaintiff's allegations, the specific events outlined in plaintiff's complaint will be summarized. At various times throughout 2001 and 2002, plaintiff went on hunger strikes as a form of protest against the conditions of the LTSU. On May 7, 2001, Lt. Bovo ordered Plaintiff to cuff up. Plaintiff did not do so. Later, Lt. Bovo returned with an extraction team, extracted Plaintiff from his cell and placed Plaintiff in a "hard cell" with Plaintiff being stripped of his clothes, and no potable water or toilet water or mattress in the cell. While in the hard cell, plaintiff learned that another prisoner in the LTSU, Andy Torres, had been placed in a "hard cell" due to an altercation with a food worker. Complaint, Doc. 3 at ¶¶ 22-24. Plaintiff contends that he was not fed until May 11, 2001 Id. at ¶¶ 18-26. He did not receive a misconduct to justify his placement in the hard cell. Id. at ¶ 28. It appears, however, that Plaintiff did get a misconduct. Id. at ¶ 29. The misconduct was for Plaintiff's refusal to return his food tray. Id. at ¶ 31. Plaintiff contends he filed a grievance and grievance appeals, to which Defendants Johnson, Dickson and Mohring responded, denying the grievance/appeals. Plaintiff "stuck up" for Torres by advising Lt. Bovo that Torres had not been in an altercation with a food worker and had wrongfully been accused. Plaintiff raised these incidents of mistreatment in the grievances he filed after being placed in the hard cell.

Plaintiff contends that the foregoing deprived him of his Eighth Amendment rights to be

3

free of cruel and unusual punishment as well as his First Amendment rights against retaliation. Specifically, plaintiff claims that Lt. Bovo engaged in these actions because Plaintiff complained of the treatment of a fellow prisoner, Andy Torres. Id. at ¶ 34.

On November 1, 2001, Plaintiff went on a hunger strike because he was not permitted to have pictures of family/loved ones, or newspapers in his cell and because the guards on the afternoon shift allegedly interfered with his legal and personal mail. Doc. 3 at ¶¶ 38-39. Plaintiff was apparently placed in the infirmary from November 10, 2001 until November 29, 2001. Id. at ¶ 41. On February 6, 2002, he filed a grievance concerning the conditions of the observation cell in the infirmary. He complains that the observation cell was filthy, with blood on the walls and bedframes, and the ceiling had toilet paper stuck on it. He was handcuffed to the bed and denied shaving items, tooth care items, change of sheets, and any recreational time in the yard. He was subjected to illumination and a video camera twenty-four hours a day. His grievance was responded to and denied by Defendants Diane Manson, Deputy Dickson and Philip Johnson. Id., at ¶ 42-45. Their roles in denying the grievances purportedly constitute deliberate indifference in violation of the Eighth Amendment. Id., at ¶ 46.

At some point in February 2002, Defendant Marsh searched Plaintiff's cell without Plaintiff being present. During the search defendant Marsh destroyed legal papers and trashed Plaintiff's food. Doc. 3 at ¶ 48. Plaintiff filed a grievance concerning the incident. Id.

On March 20, 2002, Defendant Officer Frank denied Plaintiff a food tray and the next day, Plaintiff was put on a food loaf due to a misconduct he received, which Plaintiff contends was fabricated. Doc. 3 at ¶ 50. On March 29, 2002, Plaintiff went on his second hunger strike. Sergeant Franks and his colleagues on the afternoon shift allegedly had a habit of taking Plaintiff's food as a means of control and torture.

Plaintiff was transferred out of his cell into an infirmary cell due to his second hunger strike, and on April 30, 2002, after Plaintiff was returned to his LTSU cell, he did not receive his legal and personal property or personal and hygiene supplies. Doc. 3, at ¶ 56. He alleges that

4

this was done in retaliation, presumably for engaging in hunger strikes.

On April 10, 2002, Plaintiff complained of chest pains. He was in the middle of a hunger strike. He was taken out of his cell after being cuffed and tethered. Defendant Marsh began pulling on the tether and Defendant Reid began pushing plaintiff along while escorting him to the satellite clinic. Plaintiff then refused to follow through with the nurse because the nurse "wasn't willing to listen to my condition." Doc. 3 at ¶ 62. On the way to being returned to his cell, Defendant Marsh assaulted Plaintiff by punching him and needlessly pulling on the tether. Plaintiff sustained cuts and bruises during the course of the assault.

On April 11, 2002, Defendant Nurse Karen Darren refused to take pictures of Plaintiff's bruises and scratches resulting from the alleged assault by Defendant Marsh the day before. Nurse Darren refused, stating that Plaintiff had been seen by Nurse Kime the day before. Plaintiff denied that he was examined by Nurse Kime. Plaintiff alleges that this constituted deliberate indifference.

Plaintiff assertedly did not receive medical treatment from Defendant Nurse Kime during a hunger strike from March 29, 2002 through April 29, 2002, or after the April 10, 2002, assault. After the assault Nurse Kime was deliberately indifferent to Plaintiff because Nurse Kime did not take Plaintiff's blood pressure. Doc. 3 at ¶ 67. Defendants Minnick, Urban and Stafford similarly retaliated by refusing to give Plaintiff his property. Doc. 3 at ¶¶ 70-71.

Plaintiff complains that on May 2, 2002, Defendants Urban, Minnick and Marsh assaulted Plaintiff during a search of his cell. The search was for a missing floor brush used for cleaning, which the correction officers claimed had been given to plaintiff. Doc. 3 at ¶¶ 72-76. During the assault plaintiff was hit with keys, punched, kicked, pulled to the floor, and choked with a jump suit. Id. at ¶74. After the assault plaintiff was taken for medical treatment where pictures were taken of his injuries. Id. at ¶ 78.

On May 8, 2002, Plaintiff put Defendant Cole on notice concerning the alleged assault. Doc. 3 at ¶ 81. Plaintiff complains that he was in a restricted and dirty cell from May 2, 2002

until May 9, 2002. Doc. 3 at ¶¶ 83-85. Upon being moved, Defendant Marsh verbally threatened Plaintiff, saying "[I am] gonna get you again, and I'll make sure you don't get off restrictions this time." Doc. 3 at ¶ 86.

On May 12, 2002, Plaintiff alleges that while Defendant Bowman was passing out food on the LTSU, Plaintiff allegedly overheard Defendant Marsh say to Bowman to shut Plaintiff's pie slot for food because Plaintiff doesn't eat. Doc. 3 at ¶ 89. Plaintiff then threw a sheet and blanket out of his cell through the pie slot to demand his food. Defendants Bowman and Marsh grabbed plaintiff's arm and hit Plaintiff with batons and kicked the pie slot. Plaintiff's left hand was injured by repeated blows with a baton. Doc. 3 at ¶¶ 90-91. Plaintiff was taken to be treated by Nurse Kime some time later. Plaintiff then had his clothes forcefully cut off him and he was placed in a cell with no water, no hygiene items, and was only given a blanket and a smock. Doc. 3 at ¶ 94.

On May 13, 2002, Plaintiff was placed on food loaf. Doc. 3 at ¶ 96. It was explained to Plaintiff that he was placed on food loaf because he stirred urine and feces in a milk carton and threw it on an employee. Doc. 3 at ¶ 98 -99. This restriction purportedly was unwarranted because Plaintiff "didn't misuse milk container, nor did Plaintiff assault of misused [sic] food tray." Doc. 3 at ¶ 97.

On July 2, 2002, Plaintiff 's cell was searched by Defendants Frank, Minnick and Nixon while plaintiff was held outside the cell. Id. at ¶ 103. After plaintiff returned to the cell he complained that the officers had destroyed his personal and legal property. Doc. 3 at ¶ 104. While Plaintiff was complaining, Defendants Nixon, Frank, Minnick and Marsh came into the cell and assaulted Plaintiff. Doc. 3 at ¶ 105. Plaintiff further alleges that Defendant Frank denied Plaintiff medical treatment for a swollen eye, id., at ¶ 106, until July 6, 2002, when Plaintiff was seen by a physician assistant. Id., at ¶ 109.

After incidents of misconduct Plaintiff was placed in an observation cells with illumination and a video camera on 24 hours a day for days on end. Id., at ¶ 112. Defendant

6

Stafford put him there and this caused Plaintiff to suffer psychosis. He also suffered sleep disorders, mood swings and stress from fellow prisoners who are housed near him and who are mentally ill. Defendant Stafford responded to one of Plaintiff's grievances indicating that Plaintiff was placed in a cell with 24 hour a day cameras to lessen Plaintiff's false accusations of staff misconduct. Doc. 3 at ¶ 122.

After Plaintiff complained of headaches, sleep disorders, and mood swings as a result of the distractions from being housed near mentally ill inmates, he was placed on a mild sleep aid to help with these conditions. Id. at ¶ 121. No physician authorized plaintiff being placed in twenty-four hour illumination for days at a time. Id. at ¶ 124.

Plaintiff assertedly suffers from mental illness which dates back to 1982, when he was diagnosed with paranoid schizophrenia and hospitalized at St. Mary Hospital. Since being incarcerated plaintiff continues to suffer from mental illnesses and has not treated for them. Doc. 3 at ¶¶ 134 - 36.

From August 8, 2002, to August 19, 2002, Defendant Mohring took Plaintiff's yard exercise privileges away from him without any misconduct charges. Doc. 3 at 138. However, it appears that Plaintiff was on yard restriction at the time. Id., at ¶ ¶ 139-40.

Defendant Marsh, while escorting Nurse George on medication rounds, ordered Plaintiff to the back of his cell in order to obtain his medication and if Plaintiff refused, then it was deemed a refusal of his medication. Doc. 3 at ¶ 143. Plaintiff refused to go to the back of his cell, and so did not receive his medication. Doc. 3 at ¶¶ 143 - 152.

In February of 2003, plaintiff received a letter from a religious ministry indicating that it had sent him a calendar with pictures. Plaintiff never received this calendar nor did he receive a confiscation slip for the calendar. Doc. 3 at ¶¶ 153-159. Plaintiff surmised that the guards on the afternoon shift intentionally interfered with his getting this calendar. Doc. 3 at ¶ 156. Defendant Nixon seized from another prisoner papers belonging to Plaintiff. Doc. 3 at ¶ ¶ 166 - 167; 178 - 79. Defendant Stafford and the afternoon shift also refused to give Plaintiff his Revolutionary

7

Work Newspaper out of retaliation for Plaintiff's hunger strikes. Doc. 3 at ¶ 181.

Defendant Nixon often got on the intercom and urged the prisoners in the LTSU to commit suicide. Doc. 3 at ¶¶ 161-165.

## II. Discussion

### A. First Amendment Claims

Plaintiff's potential First Amendment[2] claims are multi-fold. In general, plaintiff complains that he has been improperly precluded from receiving reading and materials sent from sources outside the institution as a form of punishment and retaliation. Plaintiff's complaints about the repeated destruction of his property and legal papers implicate the denial of access to courts. The access claims will be addressed first and then the retaliation claims.

#### 1. Denial of Access to Court

Plaintiff has failed to state a First Amendment claim of denial of access to courts because he has not identified any "actual injury." The case of Christopher v. Harbury, 536 U.S. 403 (2002), requires dismissal of this claim.

In Christopher, the Supreme Court emphasized that in order to plead an adequate denial of access to courts claim, the plaintiff must plead the existence of an injury, i.e., the loss of a non-frivolous lawsuit. The Court observed that the "very point of recognizing any access claim is to provide some effective vindication for a separate and distinct right to seek judicial relief for some wrong . . . . the right [of access claim] is ancillary to the underlying claim, without which

---

[2] Technically speaking, the First Amendment applies to the states through the Fourteenth Amendment. Bates v. City of Little Rock, 361 U.S. 516, 527-28 (1960)(Black, J. concurring); Bogen v. Doty, 598 F.2d 1110, 1111 n.1 (8th Cir. 1979)("The first amendment was made applicable to the states by the fourteenth amendment."). The standards of the First Amendment are the identical standards applicable to the States through incorporation by the Fourteenth Amendment's Due Process Clause. Johnson v. Louisiana, 406 U.S. 380, 384 (1972)("We have held that the guarantees of the First Amendment . . . are all to be enforced against the States under the Fourteenth Amendment according to the same standards that protect those personal rights against federal encroachment."). With this understanding, the court will simply refer to the First Amendment in its discussion.

8

the plaintiff cannot have suffered injury by being shut out of court." Christopher, 536 U.S. at 414-15. Therefore, "[i]t follows that the underlying cause of action . . . is an element that must be described in the complaint, just as much as the allegations must describe the official acts frustrating the claim." Id. at 415.

In addition, as part of the pleading requirement to demonstrate actual injury caused by the official actions, the plaintiff must plead that she has actually lost the opportunity to litigate that which she sought to litigate in the suit. The Court explained: "the complaint must identify a remedy that may be awarded as recompense [for the blocked suit] but not otherwise available in some suit that may yet be brought." Id. In other words, if the claims in the blocked suit may yet be brought, there has been no actual injury. As the Supreme Court succinctly explained: "[t]here is, after all, no point in spending time and money to establish the facts constituting denial of access when a plaintiff would end up just as well off after litigating a simpler case without the denial of access element." Id. With this understanding the Court then went on to hold:

> Like any other element of an access claim, the underlying cause of action and its lost remedy must be addressed by allegations in the complaint sufficient to give fair notice to a defendant. Although we have no reason here to try to describe pleading standards for the entire spectrum of access claims, this is the place to address a particular risk inherent in backward-looking claims [i.e., claims, such as the one Banks brings herein, i.e., that past behavior of officials have caused a party to lose access to courts in the past]. Characteristically, the action underlying this sort of access claim will not be tried independently, a fact that enhances the natural temptation on the part of plaintiffs to claim too much, by alleging more than might be shown in a full trial focused solely on the details of the predicate action.
>
> Hence the need for care in requiring that the predicate claim be described well enough to apply the "nonfrivolous" test and to show that the "arguable" nature of the underlying claim is more than hope. And because these backward-looking cases are brought to get relief unobtainable in other suits, the remedy sought must itself be identified to hedge against the risk that an access claim be tried all the way through, only to find that the court can award no remedy that the plaintiff could not have been awarded on a presently existing claim.

Id. at 416 (footnotes and citations omitted).

Plaintiff's complaint suffers two flaws under Christopher. First, he has failed to allege what cases he sought to bring that were frustrated and blocked. His complaint also fails to

allege a basis from which to infer that any such cases were non-frivolous.

Plaintiff mentions only two lawsuits in his complaint. The first was apparently initiated by the Department of Corrections in the Commonwealth Court, in response to Plaintiff's hunger strike. The suit likely sought a court order to force feed Plaintiff. Plaintiff does not claim interference with that suit, however, and even if he had, he would still fail to state a denial of access claim because Plaintiff won that suit on January 22, 2002. Doc. 3 at ¶ 40 & 47. Hence, there can be no denial of access to courts claim where, as here, there clearly has been no injury.

The second suit was in the Pennsylvania Superior Court, which plaintiff apparently filed in July 2002. As part of that proceeding Plaintiff sought to compel the DOC Defendants to provide him with his legal property. Doc. 3 at ¶ 118. This court takes judicial notice of the case Commonwealth v. Banks, No. 3345 EDA 2001,[3] which was an appeal to the Superior Court from a decision of the Philadelphia Court of Common Pleas denying Plaintiff's PCRA petition as untimely. The Superior Court affirmed the PCRA Court on May 5, 2003.

Plaintiff's access to courts claim based on this case fails because the Superior Court affirmed the trial court's finding that the PCRA petition was untimely. Consequently, Plaintiff fails to show that even if his right of access to the courts was violated in conjunction with this PCRA petition, he suffered an injury, i.e., that the PCRA petition was not frivolous. See, e.g., Lee v. Jones, No. CIV. A. 00-0153-BH-C, 2001 WL 102364, at *3 (S.D. Ala. Jan. 18, 2001)(in rejecting a denial of access to courts claim, the Court ruled: "it appears that Plaintiff's Rule 32 petition[4] is more than likely time-barred and is, therefore, a frivolous action. Accordingly, the undersigned finds that Plaintiff has failed to state a claim upon which relief may be granted due to his failure to establish that he suffered an actual injury in his collateral attack of his conviction

---

[3] The Superior Court's dockets are available at:
http://ujsportal.pacourts.us/WebDocketSheets/PACMSWebDocketSheets.aspx

[4] The Rule 32 petition reference is a reference to Alabama's post conviction relief procedure. See Rule 32 Alabama Rules of Criminal Procedure; State v. Wilson, 2005 WL 3118939 (Ala.Crim.App. Nov. 23, 2005).

and that the collateral attack was nonfrivolous."). Accordingly, Plaintiff may not proceed on a claim for denial of access to courts.

### 2. Retaliation

The First Amendment protects a citizen's right to petition the government. See Cheminor Drugs. Ltd. v. Ethyl Corp., 168 F.3d 119, 130 (3d Cir. 1999). Retaliation for the exercise of a constitutionally protected right is itself a violation of the Constitution which is actionable under § 1983. White v. Napoleon, 897 F.2d 103, 111 - 112 (3d Cir. 1990); Milhouse v. Carlson, 652 F.2d 371, 373-74 (3d Cir. 1981) (retaliation for exercising right to petition for redress of grievances states a cause of action); accord Anderson v. Davila, 125 F.3d 148, 161 (3d Cir. 1997) ("[A]n otherwise legitimate and constitutional government act can become unconstitutional when an individual demonstrates that it was undertaken in retaliation for his exercise of First Amendment speech.") (citing, Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle, 429 U.S. 274 (1977)).

In order to prevail on a retaliation claim, a plaintiff must establish: (1) he engaged in constitutionally protected activity; (2) he was subjected to adverse actions by a state actor; and (3) the constitutionally protected activity was a substantial motivating factor in the state actor's decision to take adverse action. Anderson v. Davila, 125 F.3d at 161 (citing Mt. Health City Sch. Dist. Bd. of Educ. v. Doyle). If the plaintiff proves these elements, the burden shifts to the state actor to prove that the same action would have been taken in any event. Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle, 429 U.S. at 287. In the prison context, the state actor may rebut a plaintiff's claim by showing that the actions taken were motivated by legitimate penological objectives. Pratt v. Rowland, 65 F.3d 802 (9th Cir. 1995).

It is Plaintiff's burden to generate proof that the Defendants were motivated by retaliation. See Hannon v. Speck, Civ. A. No. 87-3210, 1988 WL 131367, at *4 (E.D.Pa. Dec. 6, 1988) ("In bringing a §1983 action alleging such retaliation, an inmate faces a substantial burden in attempting to prove that the actual motivating factor ... was as he alleged.") (internal quotes

and citation omitted), aff'd, 888 F.2d 1380 (3d Cir. 1989)(Table).  Even if a plaintiff successfully alleges that retaliation was the substantial motivating factor, the plaintiff's claim can be defeated by "demonstrating that the same action would have been taken even in the absence of the protected conduct." Green v. Philadelphia Housing Authority, 105 F.3d 882, 885 (3d Cir. 1997).

Plaintiff's complaint, in many respects, fails to even allege what protected activity he was engaged in that lead to the supposed retaliatory acts. See, e.g., Doc. 3 at ¶ 84 (". . . an act of retaliation for reasons only Lt. Stafford, and 2-10 shift know of.").  But even giving plaintiff the benefit of the doubt, the activities that proceeded or are somehow inferentially connected to the claimed acts of retaliation cannot support a First Amendment claim of retaliation as a matter of law.

To the extent Plaintiff complains of actions taken after he was found guilty of a misconduct, any alleged retaliation claim fails on a finding of guilt in a misconduct hearing because such a finding demonstrates that the Defendants possessed a legitimate penological interest in the filing of the misconduct charge, namely, to punish Plaintiff for violating prison disciplinary rules.  The finding of guilt on the underlying misconduct charge satisfies the Defendants' burden of showing that they would have brought the misconduct charge even if Plaintiff had not engaged in protected activity.  See Vercheres v. Wilkinson, 194 F.3d 1315 (6th Cir. 1999)(Table, Text in Westlaw)("Thus, Vercheres's retaliation claim was properly dismissed, as the finding that he was guilty of stalking satisfied the defendants' burden of showing that the guard would have charged him with a violation, even if Vercheres had not filed a grievance."); Hynes v. Squillace, 143 F.3d 653, 657 (2d Cir.); Henderson v. Baird, 29 F.3d 464, 469 (8th Cir. 1994) (being found guilty of a prison rule violation based on some evidence "essentially checkmates [the] retaliation claim."), cert. denied, 515 U.S. 1145 (1995). Plaintiff's submissions concede that he was found guilty on the various misconduct charges initiated by the guards.  He simply argues that their factual underpinnings were fabricated or inaccurate.  Such an

unsupported allegation does not provide a competent basis to conclude that the misconduct charge would not have been brought in any event. Consequently, this predicate is insufficient as a matter of law.

To the extent that Plaintiff rests his retaliation claims on the fact that he was denied certain property, such as photographs, non-religious newspapers, calendars, etc., in the LTSU, the Defendants have a legitimate penological interest in not permitting him to have such property. See, e.g., Beard v. [Ronald] Banks, __ U.S. __, 2006 WL 1749604, at *7 (June 28, 2006)(finding in a class action that the policy objective of limiting privileges in the LTSU in order to motivate better behavior on the part of particularly difficult prisoners satisfies the Turner standard). Accordingly, any retaliation claim founded on the idea that plaintiff was being improperly deprived of such material fails as a matter of law.

Finally, to the extent plaintiff is seeking to advance a claim of retaliation based on his hunger strikes, the claim fails as a matter of law. Plaintiff's hunger strikes presumably were in protest to the lack of privileges and common conditions in the LTSU. Permitting such a claim to proceed would directly undermine the Court's holding in Beard v. Banks noted above.

It follows that plaintiff may not pursue redress based on a First Amendment claim.

### B. Eighth Amendment claims

The Eighth Amendment provides that "[e]xcessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted."[5] The Supreme Court has explained that the analysis of a claimed Eighth Amendment violation involves a two pronged inquiry: 1) an objective inquiry into the qualitative nature of the harm suffered from the

---

4. Technically, the Eighth Amendment applies to the states through the Fourteenth Amendment. See Estelle v. Gamble, 429 U.S. 97, 101-02 (1976) (citing Robinson v. California, 370 U.S. 660 (1962)). The standards of the Eighth Amendment barring the federal government from inflicting cruel and unusual punishments are the standards applicable to the States through incorporation by the Fourteenth Amendment's Due Process Clause. See Sistrunk v. Lyons, 646 F.2d 64, 66-67 (3d Cir. 1981)(citing Robinson v. California). With this understanding the court will simply refer to the Eighth Amendment in its discussion.

punishment and 2) a "subjective inquiry" into the mind of the person inflicting the harm. See Wilson v. Seiter, 501 U.S. 294 (1991).

The Court of Appeals for the Third Circuit has cautioned that the objective inquiry requires proof that "the deprivation was sufficiently serious to fall within the Eighth Amendment's zone of protections. . . . If not, our inquiry is at an end." Fuentes v. Wagner, 206 F.3d 335, 344 (3d Cir. 2000), cert. denied, 531 U.S. 821 (2000). In other words, although the "objective component of a cruel-and-unusual-punishment claim focuses on the harm done[,]" Sims v. Artuz, 230 F.3d 14, 21 (2d Cir. 2000), "not every governmental action affecting the interests or well-being of a prisoner is subject to Eighth Amendment scrutiny." Fuentes v. Wagner, 206 F.3d at 344 (quoting Whitley v. Albers, 475 U.S. 312, 319 (1986)) (internal quotes omitted). In determining whether a harm "was sufficiently serious to fall within the Eighth Amendment's zone of protections", Fuentes v. Wagner, 206 F.3d at 344, the guidepost is whether the prisoner has been deprived of the "minimal civilized measure of life's necessities." Young v. Quinlan, 960 F.2d 351, 359 (3d Cir. 1992)(internal quotes omitted), *superseded by statute on other grounds as stated in* Ghana v. Holland, 226 F.3d 175, 184 (3d Cir. 2000). To establish that one has been deprived of the minimal civilized measure of life's necessities, a prisoner must demonstrate the deprivation of "basic human needs, such as food, clothing, shelter, sanitation, medical care and personal safety [from physical assault]." Griffin v. Vaughn, 112 F.3d 703, 709 (3d Cir. 1997).

Plaintiff's Eighth Amendment claims are threefold. First, he complains of the general conditions of the LTSU and the behavior of the guards as depriving him of the minimal civilized measure of life's necessities. Second, he complains of deliberate indifference to his medical and mental health needs. Finally, he complains of excessive force used on several occasions and the denial of medical treatment after receiving injuries from that force.

### 1. Conditions of Confinement Claims.

Plaintiff alleges that correction officers within the LTSU verbally threatened him and

14

harassed him by performing cell searches. These claims are not legally tenable.

First, mere threats, even to a prisoner's life, made by a guard do not satisfy the objective component of the Eighth Amendment. Northington v. Jackson, 973 F.2d 1518, 1524 (10th Cir. 1992) (noting that among the actions "necessarily excluded from the cruel and unusual punishment inquiry ... are verbal threats and harassment."); Keenan v. Hall, 83 F.3d 1083, 1092 (9th Cir. 1996) (holding that verbal threats and harassment do not state an Eighth Amendment claim), *amended by*, 135 F.3d 1318 (9th Cir. 1998); O'Donnell v. Thomas, 826 F.2d 788, 790 (8th Cir. 1987)("alleged verbal threats and abuse by jail officials at the hospital did not rise to the level of a constitutional violation."); Williams v. Gobles, 211 F.3d 1271 (Table), 2000 WL 571936, *1 (6th Cir. 2000)("Williams's claim against Defendant Gobles fails to state an Eighth Amendment claim because neither verbal harassment nor threats constitute punishment within the context of the Eighth Amendment. Even the occasional or sporadic use of racial slurs, although unprofessional and reprehensible, does not rise to a level of constitutional magnitude.") (some citations omitted); Pride v. Holden, 1 F.3d 1244 (Table, text available in Westlaw)(7th Cir. 1993)("Although indefensible and unprofessional, verbal threats or abuse are not sufficient to state a constitutional violation cognizable under § 1983."). Hence, any claim under the Eighth Amendment based on the Defendants' verbal threats fails and must be dismissed.

The cell searches, even if done solely for the purpose of harassment, do not rise to a sufficiently serious objective deprivation of life's necessities. In order to found an Eighth Amendment claim on the theory of harassing cell searches, the pattern identified and the consequences flowing from that pattern must be capable of supporting a finding of cruel and unusual punishment. See Vigliotto v. Terry, 873 F.2d 1201 (9th Cir.1989) (applying general requirement that Eighth Amendment claimant allege and prove unnecessary and wanton infliction of pain to claim of retaliatory cell searches, and finding single incident insufficient); Rustan v. Rasmussen, 208 F.3d 218, *3 (8th Cir. 2000) ("As to Rustan's claim that Helmick harassed him by searching his cell, although the Eighth Amendment protects prisoners from the

15

'misery inflicted through frequent retaliatory cell searches,' Scher v. Engelke, 943 F.2d 921,
924-25 (8th Cir.1991), cert. denied, 503 U.S. 952, 112 S.Ct. 1516, 117 L.Ed.2d 652 (1992), we
conclude that the searches Rustan described did not amount to unconstitutional conduct.").

       The frequency and motive behind the searches are relevant. In Scher, the Eighth Circuit
recognized that ten searches in nineteen days (with the cell left in disarray after three of the
searches) violated the Eight Amendment when the searches were motivated by retaliation. In
Blanks v. Smith, 790 F. Supp. 192 (E.D. Wis.1992), the court held that almost daily searches
during a two-week general shakedown stated a claim. In contrast, thirteen searches in thirteen
months did not sustain an Eighth Amendment claim. See Smith v. Sublett, 983 F.2d 1077 (9th
Cir.1993)(text available in Westlaw at 1993 WL 6635 *3 n. 1). Nor would a single search.
Vigliotto, 873 F.2d at 1203. Or even sporadic searches. See McKeithan v. Jones, 2005 WL
1324878 at * 1 (June 3, 2005, M.D. Pa.) ("We conclude that the frequency of Plaintiff's searches,
one search about every eleven days, does not support an Eighth Amendment claim and will
therefore dismiss the harassment claim against Womelsdorf.').

       Here, plaintiff identifies less than a handful of searches over the period of several months.
In addition, plaintiff's own allegations indicate the a number of the searches were premised on
penological interests, such as searching for a floor brush that was not returned. Consequently,
the identified searches fail to rise to a frequency and level that will support an Eighth
Amendment violation.

       Plaintiff claims he was placed in cells that were filthy and lacked water at times. The
length of exposure to unsanitary conditions is one consideration in evaluating the objective prong
of the Eighth amendment. Whitnack v. Douglas County, 16 F.3d 954, 958 (8th Cir. 1994)("the
intolerable conditions lasted not more than 24 hours before the availability of adequate cleaning
supplies would make them tolerable."). While plaintiff does allege that he was placed in such
cells on more than one occasion, he does not allege that any particular unsanitary conditions
remained for an inordinate period of time. Accordingly, Plaintiff has failed to raise conditions

that will satisfy the objective component of an Eighth Amendment claim. Compare, Qawi v. Howard, 2000 WL 1010281, *3 (D. Del. July 7, 2000)("For example, in *[Smith v.] Copeland*[, 87 F.3d 265, 268 (8th Cir. 1996)], the Eighth Circuit Court of Appeals held that an inmate's confinement in a cell for four days with an overflowing toilet, during which time he was 'made to endure the stench of [his] own feces and urine,' did not rise to the level of an Eighth Amendment violation."); Davis v. Scott, 157 F.3d 1003, 1004 (5th Cir. 1998)(inmate being placed in cell that was "just filthy with blood on the walls and excretion on the floors and bread loaf on the floor" for three days did not meet the objective component of the Eighth Amendment)(some internal quotes omitted).

Moreover, the record essentially is silent as to whether any of the defendants knew about the conditions of the various cells, or if they did, when they were made aware of it and how long thereafter the cells remained unsanitary.[6] Thus, Plaintiff has failed to raise allegations to support a finding on the subjective prong of the Eighth Amendment with regard to any filthy cell claim.

To the extent plaintiff is complaining of being put on nutri-loaf, or "food loaf" – which is apparently a nutritional food product served to those who misuse their food – plaintiff's allegations fail to state an Eighth Amendment claim. LeMaire v. Maass, 12 F.3d 1444, 1456 (9th Cir. 1993)(temporary nutri-loaf diet did not violate Eighth Amendment); Gates v. Huibregtse, 69 Fed. Appx. 326, 326 (7th Cir. 2003)("Gates argues that a nutri-loaf diet is of itself cruel and unusual punishment. That contention is frivolous. Food served in prison must be nutritious, but it does not have to be delicious or even particularly appetizing. As Gates has not claimed that nutri-loaf lacks the nutritional value its name implies, placing him on a temporary nutri-loaf diet because of his misconduct during meal service was not of itself a violation of the Eighth

---

[6] It appears that Plaintiff did inform some of the Defendants about unsanitary conditions concerning the observation cell in which he stayed from for several days during a hunger strike. Doc. 3 at ¶¶ 41-45. The referenced grievance was filed after plaintiff was no longer in the observation cell and he does not allege that he informed the guards of specific unsanitary conditions during the time he was in the observation cell.

17

Amendment.")(citations omitted); Griffis v. Gundy, 47 Fed. Appx. 327, 328 (6th Cir. 2002) ("A diet of food loaf does not violate the prohibition against cruel and unusual punishment, because it has been shown that these loaves meet nutritional and caloric requirements for humans."); Collins v. Klotz, No. CIV. A. 92-3772, 1994 WL 371479, *4 (E.D.Pa. June 24, 1994)("Plaintiff's Eighth Amendment rights were not violated even if Food Loaf was administered punitively"). Consequently, any claim based on this condition cannot proceed.

### 2. Medical Treatment Claims

Plaintiff's allegations of denial of medical treatment are twofold. He complains that he suffers from mental illness but has never been treated for it by the defendants, and he was denied immediate medical treatment after two separate altercations with prison guards. The record fails to support a basis for relief to the extent plaintiff seeks to establish a claim for the denial of treatment for a serious medical need.

The Supreme Court has made clear that "deliberate indifference to serious medical needs of prisoners constitutes the unnecessary and wanton infliction of pain . . . proscribed by the Eighth Amendment." Estelle v. Gamble, 429 U.S. 97, 104 (1976)(internal quotations omitted). In this context the subjective prong of an Eighth Amendment "deliberate indifference" claim is met where a prison "official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists and he must also draw the inference." Farmer v. Brennan, 511 U.S. 825, 837 (1994).

Plaintiff bears the burden to allege a predicate basis from which findings on both the subjective and the objective components of the Eighth Amendment can be made. Newland v. Achute, 932 F. Supp. 529, 532 (S.D. N.Y., 1996); Pasha v. Barry, No. Civ. A. 96-466, 1996 WL 365408, *1 (D.D.C. June 21, 1996). The claim has two areas of focus: (1) deliberate indifference by prison officials to (2) a serious medical need. Manmouth County Correctional Institution Inmates v. Lanzaro, 834 F.2d 326, 346 (3d Cir. 1987). Mere allegations of

mistreatment or a disagreement over the proper course of treatment will not suffice. Id.

The denial of a reasonable request for medical treatment that results in "undue suffering or the threat of tangible residual injury" can support a finding of deliberate indifference. Id. (citing Westlake v. Lucas, 537 F.2d 857, 860 (6th Cir.1976)). Similarly, knowledge of the need for medical care accompanied by the intentional refusal to provide that care can support a finding of deliberate indifference. Id. (citing Ancata v. Prison Health Servs., 769 F.2d 700, 704 (11th Cir.1985) and Robinson v. Moreland, 655 F.2d 887, 889-90 (8th Cir.1981) (jury could properly conclude that provision of ice-pack for inmate's fractured hand constituted deliberate indifference where prison guard knew medical care was needed). And in the absence of denial, "if necessary medical treatment [i]s ⋯ delayed for non-medical reasons, a case of deliberate indifference has been made out." Id. (quoting Ancata, 769 F.2d at 704 and Archer v. Dutcher, 733 F.2d 14 (2d Cir.1984) (allegation that emergency medical care to pregnant inmate was delayed in order to make her suffer stated a claim of deliberate indifference under Estelle). In addition, deliberate indifference can be demonstrated "[w]hen ⋯ prison authorities prevent an inmate from receiving recommended treatment for serious medical needs or deny access to physician capable of evaluating the need for such treatment." Id. (quoting Inmates of Allegheny County Jail v. Pierce, 612 F.2d 754, 762 (3d Cir.1979).

"A medical need is 'serious,' in satisfaction of the second prong of the Estelle test, if it is 'one that has been diagnosed by a physician as requiring treatment or one that is so obvious that a lay person would easily recognize the necessity for a doctor's attention.'" Id. (quoting Pace v. Fauver, 479 F. Supp. 456, 458 (D.N.J.1979), aff'd, 649 F.2d 860 (3d Cir.1981)). The effect of denying medical treatment under any particular circumstances is also relevant. Where the "unnecessary and wanton infliction of pain" results from the denial or delay of adequate medical care, "the medical need is of the serious nature contemplated by the Eighth Amendment." Id. For example, where the denial or delay causes an inmate to suffer a life-long handicap or permanent loss, the medical need will obviously be considered serious. Id. (citing in support Archer, 733

F.2d at 16 (pregnant inmate who miscarried stated cognizable claim where she alleged that defendants intentionally delayed emergency medical aid in order to make her suffer); Ramos v. Lamm, 639 F.2d 559, 576 (10th Cir.1980) (delay in providing oral surgery resulted in "continued and unnecessary pain and loss of teeth"), cert. denied, 450 U.S. 1041 (1981); Laaman, 437 F. Supp. at 312 (denial of treatment may result in permanent damage or require corrective surgery); Derrickson, 390 F. Supp. at 907 (failure to perform elective surgery on inmate serving life sentence would result in permanent denial of medical treatment and would render inmate's condition irreparable). Short of such situations, each claim must be evaluated to determine whether the treatment or lack thereof implicates the "broad and idealistic concepts of dignity, civilized standards, humanity and decency" that provide the underpinnings for defining the reaches of the Eight Amendment. Estelle, 429 U.S. at 102.

Plaintiff's allegations concerning the lack of treatment for mental illness fail to provide a predicate basis for a finding of deliberate indifference. Plaintiff does not allege that prison officials were made aware of him having a prior diagnosis of a serious mental illness from a competent source or that the medical staff defendants made or were aware of plaintiff having such a diagnosis. The mere fact that plaintiff repeatedly is defiant and opposes authority certainly cannot in and of itself place defendants on notice of the need for treatment for a serious mental health disorder. And plaintiff's allegations concede that when he complained of headaches, mood swings and stress, he did receive treatment in the form of medication. A mere disagreement about whether there has been a proper diagnosis or the proper form of treatment simply falls short of the threshold showing needed to support a finding of deliberate indifference.

Plaintiff's complaints concerning the delay of medical treatment following altercations with guards in April, May and July of 2002 are intertwined with his excessive force claims based on those events. Standing alone, the injuries plaintiff suffered during these altercations do not constitute a serious medical need. Injuries such as cuts, scrapes, scratches, bruises and a swollen black eye simply do not in themselves reflect trauma that necessarily calls for immediate medical

20

treatment from a physician. Thus, whether the lack of immediate medical treatment following these incidents violated the Eight Amendment properly is considered as part of plaintiff's excessive force claims discussed below.

### C. Fourteenth Amendment Claims

Plaintiff fails to make clear whether he is alleging a procedural or substantive due process claim. A liberal reading of the complaint reveals, however, that its allegations cannot sustain any type of due process claim.

#### 1. Procedural due process

A procedural due process analysis involves a two step inquiry: (1) does the complaining party have a protected liberty or property interest and, if so, (2) does the available process comport with all constitutional requirements. Shoats v. Horn, 213 F.3d 140, 143 (3d Cir. 2000).

Plaintiff complains that Defendants deprived him of procedural due process. Plaintiff alleges that at various times he was deprived of his property. These deprivations occurred when plaintiff's cell was searched or when he was placed in a hard cell.

To the extent plaintiff complains about being temporarily dispossessed of his property as a result of his placement in the LTSU, such deprivations are not unreasonable as a matter of law. See Turner v. Safely, 482 U.S. 78, 89 (1987).[7] See, e.g., Beard v. [Ronald] Banks, __ U.S. __, 2006 WL 1749604, at *7 (June 28, 2006)(policy objective of limiting privileges in the LTSU in order to motivate better behavior on the part of particularly difficult prisoners satisfies the Turner standard).

Moreover, punishment is a legitimate penological interest. White v. Napoleon, 897 F.2d

---

[7] In Turner, the Court listed four factors guiding the review of prison regulations: (i) whether there is a valid, rational connection between the prison regulation and the governmental interest put forward to justify it; (ii) whether alternative means of exercising the right remain available to prison inmates; (iii) whether accommodation of the asserted constitutional right will have an unreasonable impact upon prison personnel or the allocation of prison resources generally; and (iv) whether there are reasonable alternatives available to the prison authorities. Turner, 482 U.S. at 89-90. The burden is on the prisoner to show that a challenged regulation is unreasonable. Covino v. Patrissi, 967 F.2d 73, 79 (2d Cir. 1992).

103, 112-13 (3d Cir. 1990) ("In addition to punishment and rehabilitation of prisoners, prison authorities have a legitimate interest in maintaining safety and security within the prison.")(emphasis added). Given the context in which the claims are advanced, Plaintiff has not pointed to any specific events that will support a finding that depriving him of his property while in the LTSU is not reasonably related to a legitimate penological interest. See, e.g., Orebaugh v. Caspari, 910 F.2d 526, 527-28 (8th Cir. 1990)("it is his [i.e., the prisoner-plaintiff's] burden to demonstrate that the policy is not reasonably related to a legitimate penological interest.").

Furthermore, to the extent Plaintiff is claiming that he has a liberty interest to be free from random acts by various Defendants such as threats, cell searches and property confiscations and Defendants have not provided adequate process before the deprivations of such "liberty or property interest," the contention is without merit. The very concept of procedural due process renders it inapt to the random acts of guards. Cf. Albright v. Oliver, 510 U.S. 266, 283-84 (1994) (Kennedy, J. concurring in the judgment)("we can assume, arguendo, that some of the interests granted historical protection by the common law of torts . . . are protected by the Due Process Clause. Even so, our precedents make clear that a state actor's random and unauthorized deprivation of that interest cannot be challenged under 42 U.S.C. § 1983 so long as the State provides an adequate post deprivation remedy."). As a matter of law, it cannot be said that the random act of guards threatening prisoners and/or engaging in cell searches constitutes an atypical and significant hardship within the meaning of Sandin v. O'Connor, 515 U.S. 472 (1995). See, e.g., Somers v. Thurman, 109 F.3d 614, 622 n. 5 (9th Cir. 1997)("the exchange of verbal insults between inmates and guards is a constant, daily ritual observed in this nation's prisons,"); McGill v. Czerniak, 83 F.3d 427 (Table, text available in Westlaw)(9th Cir. 1996)("Finally, McGill's Fourteenth Amendment due process rights were not violated because the prison's failure to adhere to regulations governing inmate searches did not present the type of atypical and significant deprivation that might conceivably create a liberty interest."). Thus, the exposure to such random acts in the present context cannot support a procedural due process

22

claim.

To the extent Plaintiff is claiming he was permanently dispossessed of his property, he was not deprived of due process of law because he has adequate post-deprivation remedies. See, e.g., Hudson v. Palmer, 468 U.S. 517 (1984). The Commonwealth of Pennsylvania provides an adequate post deprivation remedy in the forms of the DOC grievance system and/or a state law tort suit against the Defendants.[8] Such procedures satisfy the Fourteenth Amendment's procedural due process guarantee. See Zinermon v. Burch, 494 U.S. 113, 132 (1990)("where the State is truly unable to anticipate and prevent a random deprivation of a liberty interest, postdeprivation remedies might satisfy due process."). See also Austin v. Lehman, 893 F. Supp. 448, 454 (E.D. Pa. 1995) (both inmate grievance procedure and state tort law action constituted adequate post-deprivation remedies); Robinson v. Ridge, 996 F. Supp. 447, 450 n. 4 (E.D. Pa. 1997)(DOC grievance procedure constituted an adequate post deprivation procedure and hence no procedural due process claim was available), aff'd, 175 F.3d 1011 (3d Cir. 1999)(Table); Rogers v. Mrs. Brown, No. Civ. A. 95-7867, 1996 WL 608473, *2 (E.D. Pa. Oct. 24, 1996) (DOC grievance procedure and tort suit in state court  provide adequate post deprivation remedies).

To the extent Plaintiff complains of being deprived of property pursuant to Bureau of Corrections  policy[9] as seizures of his family photos, Doc. 3 at ¶ 39, or seizures of his Revolutionary Work Newspaper, id., at ¶¶ 180-183, etc., such deprivations are a mere consequence of his placement in the LTSU. Such deprivations fail to state a procedural due process claim because the established procedures for determining that Plaintiff should be placed

---

[8] To the extent Plaintiff complains that he was placed on grievance restrictions and/or his grievances went unresponded to and hence, his grievance remedy was not an adequate one, he still had an adequate post deprivation remedy in the state courts.

[9] See, e.g., Logan v. Zimmerman Brush Co., 455 U.S. 422, 435-436 (1982) (postdeprivation remedies do not satisfy due process where deprivation is caused by established state procedures).

in the LTSU (and thereafter kept in the LTSU) provide all the process that is due. See DC-ADM 802[10] (describing LTSU and procedures for placement therein). See also, Wilkinson v. Austin, 545 U.S. 209, __, 125 S.Ct. 2384, 2397 (2005) (considering challenge that inmates had a liberty interest in avoiding assignment to a "Supermax" prison and determining that the procedures for placement therein under informal nonadversary process and periodic review satisfied procedural due process).

The same analysis disposes of Plaintiff's claims that his very placement in the LTSU deprived him of a liberty interest. Even if placement in the LTSU implicated a liberty interest under Sandin, the procedures used to place an inmate in the LTSU and for periodic review satisfy the due process clause. Cf. Shoats v. Horn, 213 F.3d 140 (3d Cir. 2000)(state prisoner in long-term administrative segregation received due process, where at outset of segregation he received notice of the charges against him, an opportunity to be heard, and the right to appeal to the prison superintendent, and periodic review every 30 days thereafter with opportunity for a personal interview with program review committee).

To the extent Plaintiff complains that the Defendants' searches denied him procedural due process, the claims fail as a matter of law. Plaintiff possesses no liberty interest to be free of cell searches and so, even were such searches are conducted pursuant to established policy, they do not deprive Plaintiff of a liberty interest. See, e.g., McGee v. Roberts, 152 F.3d 927 (Table, text available in Westlaw)(9th Cir. 1998)("To the extent McGee contends that he was denied due process because prison officials performed 'calculated harassment' by searching his cell, seizing legal materials and leaving his legal materials in 'total disarray,' this contention lacks merit because he had no legitimate expectation of privacy, and the search was not a significant deprivation which created a liberty interest."); Mitchell v. Dupnik, 75 F.3d 517, 523 (9th Cir. 1996)(cell search even in violation of jail regulation did not deprive prisoner of liberty interest);

---

[10]The court takes judicial notice of this policy which is available at http://www.cor.state.pa.us/standards/lib/standards/DC-ADM_802_Administrative_Custody_Proc edures.pdf (Site last visited on June 30, 2006).

Ramirez v. Holmes, 921 F.Supp. 204 (S.D.N.Y. 1996)("Neither a false misbehavior report nor an improper search constitute restraints on the plaintiff. Even if they did or if they otherwise imposed significant hardship on Ramirez, these isolated incidents do not begin to approach the severity of the types of violations which have been found to satisfy the Sandin standard."); Kingwood v. Coombe, No. 96 CIV. 0432, 1997 WL 323913, *2 (S.D.N.Y. June 13, 1997) ("improper cell search does not implicate liberty interest under Sandin"); Duamutef v. O'Keefe, NO. 6:94-CV-0470, 1996 WL 673125 (N.D.N.Y., March 14, 1996) ("under Sandin, courts have found no protected liberty interest for due process claims involving . . . the search of an inmate's cell in alleged violation of prison regulations"), aff'd, 98 F.3d 22 (2d Cir. 1996).

A claimed liberty interest must be assessed by what deprivations a prisoner may reasonably expect to encounter in prison. In short, Plaintiff cannot establish that the searches were atypical. Thus, even if Minnick and/or other Defendants conducted the searches of plaintiff's cell with a harassing intent, plaintiff's due process rights could not have been violated because another guard without such an intent could have conducted these same searches with the same frequency and Plaintiff would not have been deprived of a liberty interest. See, e.g., DOC Inmate Handbook (2005 ed.) II.E.6 ("A random search of your cell may be conducted at any time but no later than one hour after the facility is locked up for the evening."); DOC Policy No. DC-ADM 203 VI.C.3 ("Random cell searches may be conducted at any time but no later than one hour after the facility is locked up for the evening.");[11] Schenck v. Wood, NO. CY-94-3117-LRS,

---

[11] The court takes judicial notice of these DOC regulations. *See e.g.*, Hodges v. Klein, 421 F.Supp. 1224, 1233 (D.N.J. 1976) (court took judicial notice of written prison regulations of New Jersey's Department of Corrections and Parole), *aff'd*, 562 F.2d 276 (3d Cir. 1977); Stokes v. Duval, No. 95-10541-GAO, 1995 WL 598958 (D. Mass. Sept. 26, 1995) (court took judicial notice of the regulations of the Massachusetts Department of Corrections). *See also* Gleave v. Graham, 954 F.Supp. 599, 605 (W.D.N.Y. 1997) ("The court also takes judicial notice of the BOP's Program Statement Numbers 7300.08 and 7310.03 which set forth the BOP's official internal agency guidelines that are specifically applied to the challenged fees and thus relevant to a thorough discussion of this matter."), *aff'd*, 152 F.3d 918 (2d Cir. 1998)(Table); Antonelli v. Ralston, 609 F.2d 340, 341, n. 1 (8th Cir.1979) (judicial notice was taken of a Federal Bureau of Prison's Program Statement).

1996 WL 190814 (E.D. Wash., Jan. 29, 1996)("In *Mitchell v. Dupnik*, the Ninth Circuit found that violation of a jail regulation providing for inmates to be present when their legal papers were searched did not present the type of atypical and significant deprivation in which a state might conceivably create a liberty interest, **because the prisoner, his cell and all his other possessions were already subject to inspection at any time for any or no reason**.")(emphasis added). Consequently, plaintiff's complaints about improper cell searches do not state a claim under the Fourteenth Amendment's procedural due process clause.

Plaintiff advances many accusations about the role of a number of defendants in the grievance process. These allegations likewise fail to support a procedural due process because Plaintiff has no liberty interest in the grievance procedures. See, e.g., Anderson v. Colorado Dept. of Corrections, 185 F.3d 873 (Table), 1999 WL 387163, *2 (10th Cir. 1999)("petitioner's allegations relating to the requirements of the Department of Corrections grievance procedure do not support a due process claim because those procedures do not create any liberty interest in the incarcerated petitioner."); Metcalf v. Veita, 156 F.3d 1231 (Table), 1998 WL 476254, *2 (6th Cir. 1998)("As to the conduct attributed to the warden personally, consisting of denying Metcalf's appeals and grievances, Metcalf did not state a due process claim because he suffered no atypical and significant hardship as a result."); Adams v. Rice, 40 F.3d 72, 75 (4th Cir. 1994); Overholt v. Unibase Data Entry, Inc., 221 F.3d 1335 (Table), 2000 WL 799760, *3 (6th Cir. 2000) ("The defendants were not obligated to 'properly' respond to Overholt's grievances because there is no inherent constitutional right to an effective prison grievance procedure.") (citations omitted); United States v. Jiles, 658 F.2d 194, 200 (3d Cir. 1981)("the simple fact that state law prescribes certain procedures does not mean that the procedures thereby acquire a federal constitutional dimension."). It follows that plaintiff's complaints about the Defendants' roles in the grievance process fail to allege a viable basis for proceeding on a Procedural Due Process Claim.

### 2. Substantive Due process

To the extent that Plaintiff seeks to raise a substantive due process claim, such claims are

26

all barred by the doctrine of Albright v. Oliver, 510 U.S. 266 (1994)(plurality) and Graham v. Connor, 490 U.S. 386 (1989).

The Supreme Court "has always been reluctant to expand the concept of substantive due process because the guideposts for responsible decisionmaking in this unchartered area are scarce and open-ended." Albright v. Oliver, 510 U.S. 266, 271-272 (1994) (plurality opinion). As a consequence, the Court has limited the availability of claims under substantive due process to those that are not covered by the other amendments. County of Sacramento v. Lewis, 523 U.S. 833 (1998). The Supreme Court has described this limitation as follows:

> Graham simply requires that if a constitutional claim is covered by a specific constitutional provision, such as the Fourth or Eighth Amendment, the claim must be analyzed under the standard appropriate to that specific provision and not under the rubric of substantive due process.

County of Sacramento, 523 U.S. at 843.[12]

The First Amendment provides the textual source for protecting Plaintiff's right to file lawsuits and grievances as a function of petitioning the government without fear of retaliation. Larsen v. Senate of the Commonwealth of Pennsylvania, 154 F.3d 82, 95 (3d Cir. 1998) (allegations of retaliation implicating the exercise of First Amendment rights "state a claim for violation of clearly established rights under the First Amendment."), cert. denied, 525 U.S. 1144 (1999). Accordingly, the standards of the First Amendment provide the appropriate guideposts for analyzing Plaintiff's complaints concerning retaliatory actions by prison officials in response to his protests or vouching for fellow inmates, access to courts and denial of newspapers and certain reading and/or expressive materials while housed in the LTSU. As previously explained,

---

[12]The holding of the Supreme Court in Graham and Albright is not that the specific amendment must apply in order to supplant a substantive due process claim. In each case the specific amendment under consideration (i.e., the Fourth Amendment) did not, strictly speaking, apply, because the defendants were state actors. The Court nevertheless utilized Fourth Amendment standards because those standards specifically addressed the factual situation of arrests without probable cause (Albright) and excessive force in effectuating arrests (Graham) and provided a grounded textual analysis when compared with the standards of substantive due process.

27

plaintiff's claims implicating those standards cannot proceed to jury resolution.

As for Plaintiff's complaints of harassment and specific threats, including harassing searches, retaliatory destruction of property and the like, such claims are specifically covered under the standards of the Eighth Amendment relating to cruel and unusual punishment. Therefore, such claims are not cognizable as a substantive due process violation.[13]

### D. Excessive Force Claims

Plaintiff's complaint and his pretrial submissions advance a viable Eighth Amendment claim for use of excessive force and the denial of medical treatment directly following the use of that force. The record demonstrates that these claims can be submitted to a jury.

Plaintiff contends that the afternoon guards developed a pattern of assaulting of inmates within the LTSU and this pattern continued despite plaintiff's grievances concerning the same. Complaint at ¶ 68, 81. The beatings occurred in places where they would not be captured on

---

[13] Even assuming for the purpose of argument that some aspect of the above-referenced claims is not properly analyzed under the First or Eighth Amendments, Plaintiff's claims would still fail under a substantive due process analysis. A substantive due process claim cannot be sustained unless the state actor engages in conduct that "shocks the conscience" or "interferes with rights implicit in the concept of ordered liberty." *See* United States v. Salerno, 481 U.S. 739, 746 (1987). Plaintiff's claims such as verbal threats, harassment based upon cell searches, the random taking of property, and so forth do not shock the conscience nor do they interfere with rights implicit in the concept of ordered liberty given the setting in which they occurred. See, e.g., Strauss v. Ray, 221 F.3d 1336 (Table, text available in Westlaw)(6th Cir. 2000)("Strauss's claims that prison officials were disrespectful to him lack an arguable basis in law because claims that a prison official used abusive language, or generally harassed an inmate, do not amount to an Eighth Amendment or substantive due process violation. *See Ivey v. Wilson*, 832 F.2d 950, 954- 55 (6th Cir.1987)."); Chidubem v. McGinnis, 134 F.3d 370 (Table, text available in Westlaw)(6th Cir. 1997)("Merely searching a prisoner's cell . . . is not an egregious abuse of authority which violates the substantive due process rights of the prisoner. *See Cale v. Johnson.* 861 F.2d 943, 949-50 (6th Cir. 1988)."); Pittsley v. Warish, 927 F.2d 3, 7 (1st Cir. 1991)("threats causing fear for plaintiff's life [is] not an infringement of a constitutional right, [and] thus not actionable under § 1983."); Shabazz v. Cole, 69 F. Supp.2d 177, 200 (D. Mass. 1999)(". . . conduct which is offensive to even hardened sensibilities outside a prison may not be as shocking inside a prison. Without even a suggestion of physical injury, Cole's verbal abuse and racial epithets, although continuing for a long period of time, fall short of conscience shocking conduct.")(internal quotations omitted). Accordingly, Plaintiff's substantive due process claims would fail under a substantive due process analysis in any event.

video camera. Plaintiff assertedly was a victim of this pattern on at least four separate occasions: April 10, 2002; May 2, 2002; May 12, 2002; and July 2, 2002. On three of these occasions Plaintiff purportedly was denied immediate medical attention for the injuries he sustained as the result of the assaults, which included scratches, cuts, bruises, a swollen left hand and a black eye. See e.g. Complaint at ¶¶ 63, 76 & 106.

The seminal Supreme Court case discussing the contours of an excessive force claim within a prison setting is Hudson v. McMillian, 503 U.S. 1 (1992). There, the Court clarified that an excessive force claim generally will be recognized where (1) a prisoner is subjected to more than the de minimus use of force; (2) the force was excessive to any existing institutional need; (3) the force was objectively unreasonable under the circumstances; and (4) the force constituted the wanton and unnecessary infliction pain. Id. at 5. The central issue in Hudson was "whether the use of excessive force against a prisoner may constitute cruel and unusual punishment when the inmate does not suffer serious injury." Id. at 4. The Court concluded that it may in appropriate cases.

In Hudson, the prisoner was placed in handcuffs and shackles and taken out of his cell for transport to an administrative area of the prison. On the way there one of the guards assertedly punched the prisoner in the mouth, eyes, chest, and stomach while the other held him in place and punched him from behind. Id. The prisoner suffered minor bruises and swelling of the face, mouth and lips. The incident also loosened his teeth and cracked a partial dental plate. A magistrate judge entered judgment in favor of the prisoner on his excessive force claim after trial. The Court of Appeals reversed. It held that in order to establish an excessive force claim a prisoner must prove: 1) significant injury; 2) resulting only from the use of excessive force; 3) the amount of force was objectively unreasonable; and 4) the conduct constituted the unnecessary and wanton infliction of pain. Id. at 5. The Appeals Court reasoned that the prisoner had failed to carry his burden because he had only suffered minor injuries. Id.

The Supreme Court reversed, holding that there is no significant injury requirement for

29

excessive force claims under the Eighth Amendment. It explained: "whenever prison officials stand accused of using excessive physical force in violation of the Cruel and Unusual Punishments Clause, the core judicial inquiry is that set out in Whitley[ v. Albers, 475 U.S. 312 (1986)]: whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." Id. at 6-7. In other words, "[w]hen prison officials maliciously and sadistically use force to cause harm, contemporary standards of decency always are violated" and a prisoner may proceed on an Eighth Amendment claim notwithstanding the absence of serious injury. Id.

The Third Circuit likewise has held that a prisoner may proceed to trial on an excessive force claim in the absence of serious injury when the record "will support a reliable inference of wantonness in the infliction of pain." Brooks v. Kyler, 204 F.3d 102, 108 (3d Cir. 2000) (citing Whitley, 475 U.S. at 322 and Sampley v. Ruettgers, 704 F.2d 491, 495 (10th Cir.1983) (holding that wantonness exists when a prison guard intends to harm an inmate)); Smith v. Mensinger, 293 F.3d 641, 647-50 (3d Cir. 2002) ("the pivotal inquiry in reviewing an inmate's § 1983 claim for excessive force is 'whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm.'") (quoting Brooks, 204 F.3d at 106). The central inquiry in evaluating such a claim is whether unnecessary force was used by the actor, not the effect of the use of such force. Id. ("In Hudson, the Court distinguished between prisoner conditions-of-confinement and medical-deprivation claims, on the one hand, and the wanton use of unnecessary force claims on the other. Although the former cannot survive without evidence that a deprivation was "harmful enough" . . . , the latter kind of claim has no such requirement"). Accordingly, to establish an Eighth Amendment excessive force claim, the plaintiff must only adduce evidence that the force was not applied in a good-faith effort to maintain or restore discipline, but maliciously and sadistically to cause harm.[14]

---

[14] This is not to say that the extent of the injuries suffered by a plaintiff is irrelevant. The Supreme Court opined:

Plaintiff's excessive force claims are sufficient to create triable issues of fact under the above standards. Plaintiff in essence indicates that on particular occasions in April, May, and July of 2002, he was attacked by the afternoon guards without justification, was subjected to more than the de minimus use force, the amount of force used far exceeded any institutional purpose existing at the time, the force was not applied to maintain or restore order and discipline or for other legitimate institutional purposes, and the force reflected the wanton and unnecessary infliction of pain. In addition, plaintiff has alleged that he was denied immediate medical treatment for the injuries he sustained from the beatings, which likewise could be found by the trier of fact to reflect the purposeful and unnecessary infliction of pain.

Plaintiff's "supplemental response to defendants' trial brief filed pursuant to order of court issued June 21, 2006" (Doc. No. ___) highlights the events forming his excessive force claims. The incident on April 10, 2002, arose after Plaintiff had been transported to see the nurse due to chest pains during one of his hunger strikes. Upon returning to his cell, plaintiff alleges that Defendant Marsh began punching him and Defendant Reid needlessly pulled on the tether. Plaintiff remained handcuffed and tethered during the incident. Plaintiff suffered cuts and

---

Under the Whitley approach, the extent of injury suffered by an inmate is one factor that **may** suggest 'whether the use of force could plausibly have been thought necessary' in a particular situation, 'or instead evinced such wantonness with respect to the unjustified infliction of harm as is tantamount to a knowing willingness that it occur.' 475 U.S., at 321, 106 S.Ct., at 1085. In determining whether the use of force was wanton and unnecessary, it may also be proper to evaluate the need for application of force, the relationship between that need and the amount of force used, the threat "reasonably perceived by the responsible officials," and "any efforts made to temper the severity of a forceful response." *Ibid.* The absence of serious injury is therefore relevant to the Eighth Amendment inquiry, but does not end it."

Hudson, 503 U.S. at 7 (emphasis added). The Third Circuit likewise has acknowledged that a fact finder is free to "consider the de minimus nature of injuries along with all the other circumstances in concluding that the force employed could not have risen to the level required for an Eighth Amendment violation." Smith, 293 F.3d at 649.

31

bruises during the incident, but was denied immediate medical attention for his injuries and placed in a hard cell for several days. At this junction plaintiff's version of the events has not been rebutted. And in any event, if the finder of fact were to credit plaintiff's version of the incident, it would be free to conclude that plaintiff was subjected to the wanton and unnecessary infliction of pain.

The same is true for the incident occurring on May 2, 2002. Plaintiff alleges that on May 2, 2002, Defendants Urban, Minnick, and Marsh searched plaintiff's cell for a missing floor brush. After the search plaintiff began to complain about the dishevelment of his cell, whereupon Defendants Marsh, Nixon, Minnick and Frank came into plaintiff's cell and punched, kicked and struck plaintiff with keys. He was then pulled to the floor and choked with a jump suit. Plaintiff was denied immediate medical attention for the swollen eye he sustained during the altercation and placed in a hard cell for several days. At this junction plaintiff's version of the events has not been rebutted. And in any event, if the finder of fact were to credit plaintiff's version of the incident, it would be free to conclude that plaintiff was subjected to the wanton and unnecessary infliction of pain.

The incident on May 12, 2002, likewise will support an excessive force claim. Plaintiff assertedly was told he should be denied his food trays because he was on a hunger strike. Plaintiff was then denied his food trays and he reacted by throwing things out of his cell. Defendants Marsh and Bowman allegedly grabbed plaintiff and struck his hand several times with a baton while plaintiff remained in his cell. He was placed in a hard cell for several days. At this junction plaintiff's version of the events has not been rebutted.[15] And in any event, if the finder of fact were to credit plaintiff's version of the incident, it would be free to conclude that plaintiff was subjected to the wanton and unnecessary infliction of pain based on the beating.

---

[15] Plaintiff did receive prompt medical attention on this occasion and the nurse took pictures of his left hand. Thus, a purposeful denial of medical treatment claim to prolong pain and suffering cannot be sustained on the events of May 12, 2002.

Finally, plaintiff may be able to sustain his excessive force claim based on the events of July 2, 2002. Plaintiff alleges that a search of his cell was conducted by Defendants Nixon, Frank, Minnick and Marsh while plaintiff remained handcuffed and tethered outside the cell. Plaintiff complained of the condition of his cell after the search, and the defendants came into plaintiff's cell and assaulted him. Plaintiff sustained a black eye and was denied medical treatment for at least twelve hours. At this junction plaintiff's version of the events has not been rebutted. And in any event, if the finder of fact were to credit plaintiff's version of the incident, it would be free to conclude that plaintiff was subjected to the wanton and unnecessary infliction of pain.

Plaintiff further alleges that he complained of the pattern of the afternoon guards to assault inmates through a number of grievances. He also complained and grieved the denial of immediate medical attention directly following three of the assaults. On each occasion his grievance was denied as being without merit and nothing further was done. Under these circumstances plaintiff may proceed on his Eighth Amendment excessive force claims as outlined above.

Date: _August 1, 2006_


_David Stewart Cercone_
David Stewart Cercone
United States District Judge


cc:  Gary Banks
     CT-8731
     SCI Fayette
     Box 9999
     LaBelle, PA 15450-0999

     Mariah Passarelli, Esquire
     Office of the Attorney General
     Sixth Floor, Manor Complex
     564 Forbes Avenue
     Pittsburgh, PA 15219

34